IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| STATE FARM FIRE & CASUALTY CO. | : |
|  | : |
| v. | : Civil Action No. DKC 13-3088 |
|  | : |
| GEORGE W. HUGUELY, V, *ET AL.* | : |
|  | : |

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this declaratory judgment action is a motion for summary judgment filed by Plaintiff State Farm Fire and Casualty Company ("Plaintiff"). (ECF No. 23). The issues have been briefed and a hearing was held on January 10, 2017. For the following reasons, the motion for summary judgment will be denied.

## I.  Background[1]

This case involves the intersection of three actions in which George W. Huguely, V ("Defendant") is the defendant: a criminal case, a civil case, and this insurance coverage case.

### A.  Criminal Case

Early on the morning of May 3, 2010, one of Yeardley Love's roommates found her dead in her bedroom. *Huguely v. Commonwealth*, 63 Va.App. 92, 99-100 (2014). Defendant, who had dated Yeardley Love "on and off" for years, had been drinking

---

[1] Unless otherwise noted, the facts outlined here are undisputed or construed in the light most favorable to Defendant, the non-moving party.

alcohol heavily on May 2 and went to her house late that night. *Id.* at 99, 101.   He admitted to police that he kicked a hole in her bedroom door to gain access to her room, had a physical altercation with her during an argument, and left her bleeding on her bed.   *Id.* at 102 n.4.   In a 2012 trial, a jury in the Circuit Court for the City of Charlottesville, Virginia found Defendant responsible for her death and guilty of second degree murder.   *Id.* at 105.   Subsequently, the Court of Appeals affirmed Defendant's conviction, *id.* at 131, and the Supreme Court of Virginia and the Supreme Court of the United States each denied Defendant's petitions for review, *see Huguely v. Virginia*, 136 S.Ct. 119 (2015) (mem.); Petition for Writ of Certiorari at 3, *Huguely v. Virginia*, 136 S.Ct. 119 (2015) (No. 14-1474).   Defendant has since filed a Petition for Writ of Habeas Corpus in the Charlottesville court where his trial was originally held.   (ECF No. 25-2).   The post-conviction proceedings are ongoing.

### B.   Civil Case

On April 26, 2012, interested party Sharon D. Love ("Ms. Love"), as administrator of the estate of Yeardley Love, brought a civil suit against Defendant in the Circuit Court for the City of Charlottesville.   (ECF No. 1-1).   Her amended complaint alleges that Defendant was the proximate cause of Yeardley Love's injuries and death.   (ECF No. 1-2 ¶ 13).   The alternative

counts of the complaint include ordinary negligence, "gross negligence – indifference and acting with utter disregard of caution," "willful and wanton negligence – acting with conscious disregard and reckless indifference," "assault and/or battery," and punitive damages. (*Id.* at 4-9). Based on section 8.01-419 of the Virginia Code, the suit alleges Yeardley Love had a life expectancy of another 58.9 years and seeks nearly thirty million dollars in compensatory damages and an additional one million dollars in punitive damages. (*Id.* at 10-11). In November 2015, the circuit court stayed its proceedings to allow this court to act in the instant insurance coverage case, but some discovery between those parties has continued. (*See* Case No. DKC-13-1479, ECF No. 73-4, at 2-3). Trial is now set for July 2018. (ECF No. 25, at 6).

### C.    Insurance Case

The case in this court concerns whether Plaintiff, an insurance company, is contractually obligated to defend and to indemnify Defendant in the Civil Case. Interested party Andrew Murphy, III, Defendant's step-father (together with Defendant and interested party Marta Murphy, "Respondents"), purchased a homeowners' insurance policy ("the Policy") from Plaintiff for Respondents' home in Maryland. (ECF No. 23-4). The Policy includes broad indemnification provisions stating that "[i]f a claim is made or a suit is brought against an insured for

3

damages because of bodily injury . . . to which this coverage applies, caused by an occurrence, we will: 1. pay up to our limit of liability for the damages for which the insured is legally liable; and 2. provide a defense at our expense . . . ." (*Id.* at 20).   After Ms. Love filed her complaint in the Civil Case, Defendant sought coverage from both Plaintiff (ECF No. 1 ¶ 22) and Chartis Property Casualty Company ("Chartis"), which insured Mr. and Mrs. Murphy under two other policies (*See* Case No. DKC-13-1479, ECF No. 1).   Chartis has been providing a defense for Defendant under a reservation of rights (*Id.* ¶ 54), and it filed a declaratory judgment action in this court on May 23, 2013 (the "Chartis Case").

On June 28, 2013, Plaintiff acknowledged Defendant's claim for coverage in the Civil Case and told Defendant that it would be investigating his claims under the Policy.  (ECF No. 1 ¶ 33). During its investigation, Plaintiff sought to examine Defendant under oath, but he has refused to submit to such an examination. (ECF Nos. 23-7; 23-8).  Defendant's counsel in the Criminal Case told Plaintiff that Defendant would "decline to meet with you unless and until his criminal matters are fully concluded." (ECF No. 23-8).

Plaintiff then initiated this suit, on November 1, 2013, naming Respondents and Sharon Love as interested parties and seeking a declaratory judgment that it was not required to

4

defend or to indemnify Defendant in the Civil Case under the Policy. (ECF No. 1). Plaintiff alleged that Defendant's refusal to cooperate with its investigation violated a provision of the Policy setting out the insured's duties after a loss. (*Id.* ¶ 45). With regard to liability coverage, the Policy requires an insured "shall perform the following duties" and "shall cooperate with [Plaintiff] in seeing that these duties are performed: . . . at our request, assist in: . . . securing and giving evidence and obtaining the attendance of witnesses." (ECF No. 23-4, at 23). The complaint alleges that Defendant's refusal to submit to an examination constituted a material breach of the Policy and resulted in actual prejudice to Plaintiff's ability to evaluate the Civil Case and to identify defenses to its coverage obligations, which included issues over Defendant's residency and provisions in the Policy that exclude coverage for injuries that are "either expected or intended by the insured; or . . . the result of willful and malicious acts of the insured," (the "Exclusions"). (*Id.* ¶¶ 32, 55-63).

At the time Plaintiff filed its complaint, the court had already stayed the Chartis Case, pending Defendant's direct appeal in the Criminal Case. (Case No. DKC-13-1479, ECF No. 36). Plaintiff consented to a similar stay in this case, which was entered on December 6, 2015. (ECF Nos. 7; 8). On January 5, 2016, after Defendant had exhausted all direct appeals in his

criminal proceedings, the court reopened the Chartis Case. (Case No. DKC-13-1479, ECF No. 56).   Plaintiff filed a motion to reopen this case on November 2, 2016, which was granted on November 22.   (ECF Nos. 15; 21).   Plaintiff then filed the instant motion for summary judgment, arguing that both the Exclusions and Defendant's failure to cooperate provide bases to deny coverage.   (ECF No. 23).   Respondents and Ms. Love responded in opposition.   (ECF Nos. 25; 27).   On January 10, 2017, the court held a joint hearing on the instant motion and a motion for summary judgment in the Chartis Case.

## II.  Standard of Review

A motion for summary judgment will be granted only if there exists no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.   *See* Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008).   To prevail on a motion for summary judgment, the moving party generally bears the burden of showing that there is no genuine dispute as to any material fact.   *Liberty Lobby*, 477 U.S. at 248-50.   A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."   *Id.* at 249.   In undertaking this inquiry, a court must view the facts and the reasonable

6

inferences drawn therefrom "in the light most favorable to the party opposing the motion," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *see also EEOC v. Navy Fed. Credit Union,* 424 F.3d 397, 405 (4th Cir. 2005), but a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala,* 166 F.Supp.2d 373, 375 (D.Md. 2001) (citation omitted).

## III. Applicable Law

In diversity actions, a district court applies the substantive law and choice of law rules of the state in which the court sits. *Padco Advisors, Inc. v. Omdahl*, 179 F.Supp.2d 600, 605 (D.Md. 2002) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)). In contract claims, Maryland applies the doctrine of *lex loci contractus*, meaning that the law of the place where the contract was made applies. *Allstate Ins. Co. v. Hart*, 327 Md. 526, 529 (1992). "The *locus contractus* is the place where the last act is performed which makes an agreement a binding contract." *Grain Dealers Mut. Ins. Co. v. Van Buskirk*, 241 Md. 58, 65-66 (1965). In an insurance contract, the delivery of the policy and the payment of the premiums constitute these "last acts." *Id.* (citing *Sun Ins. Office v. Mallick*, 160 Md. 71, 81 (1931)). Although it appears that the

Policy was addressed to Mr. Murphy in California (ECF No. 23-4, at 2, 4), Plaintiff contends that it was delivered to the Murphys at their Maryland address (ECF No. 23-2, at 15). Plaintiff argues in the alternative that California law would apply Maryland law because the property insured was in Maryland. (ECF No. 23-2, at 16). Neither Respondents nor Ms. Love dispute that Maryland substantive law is applicable here. Maryland law does not, however, govern procedural rules in this court, even when jurisdiction is based on diversity.

## IV. Declaratory Judgment While State Action Is Pending

Respondents argue that declaratory judgment is not appropriate at this time, given the ongoing nature of the Civil Case. "Federal standards guide the inquiry as to the propriety of declaratory relief in federal courts, even when the case is under the court's diversity jurisdiction." *White v. Nat'l Union Fire Ins. Co.*, 913 F.2d 165, 167 (4th Cir. 1990). Under federal law, district courts have "some measure of discretion [as to whether] to entertain a declaratory judgment action that is otherwise properly within its jurisdiction." *Nautilus Ins. Co. v. Winchester Homes, Inc.*, 15 F.3d 371, 375 (4th Cir. 1994). The United States Court of Appeals for the Fourth Circuit has held that district courts should not entertain a declaratory judgment action during the pendency of a related state proceeding "when the result would be to 'try a controversy by piecemeal, or to

try particular issues without settling the entire controversy.'" *Mitcheson v. Harris*, 955 F.2d 235, 239 (4th Cir. 1992) (quoting *Aetna Cas. & Sur. Co. v. Quarles*, 92 F.2d 321, 325 (4th Cir. 1937)).  A court must consider four factors in deciding whether to make a declaratory judgment in such a case:

> (i) the strength of the state's interest in having the issues raised in the federal declaratory action decided in the state courts; (ii) whether the issues raised in the federal action can more efficiently be resolved in the court in which the state action is pending; (iii) whether permitting the federal action to go forward would result in unnecessary "entanglement" between the federal and state court systems, because of the presence of "overlapping issues of fact or law[;]"[] and (iv) whether the declaratory judgment action is being used merely as a device for "procedural fencing."

*Myles Lumber Co. v. CNA Financial Corp.*, 233 F.3d 821, 824 (4th Cir. 2000) (quoting *Nautilus*, 15 F.3d at 377).

Respondents contend that declaratory judgment is inappropriate in this case.  (ECF No. 25, at 11-14).[2]  They maintain that the first and fourth factors are "seemingly neutral," while the second and third factors weigh against declaratory action here.  (*Id.* at 11-12).  The Fourth Circuit held in *Mitcheson* that, with regard to the first factor, the district court should have refrained from deciding a coverage case where Maryland law would preclude a state court from

---

[2] Ms. Love confirmed at the motions hearing that she has no objection to handling this declaratory judgment action prior to the Civil Case.

issuing declaratory judgment and the legal issues in the coverage suit were "close" and "problematic." 955 F.2d at 236, 240. The same concerns are not present here. Maryland law governs the contract, but the Civil Case is taking place in Virginia, which clearly has little interest in resolving questions of Maryland law. This case also does not appear to be a "procedural fencing" case in which "a party has raced to federal court in an effort to get certain issues that are already pending before the state courts resolved first in a more favorable forum." *Nautilus*, 15 F.3d at 380. Accordingly, neither the first nor the fourth factor weighs against entertaining the declaratory judgment action here.

Respondents argue that it would be wasteful to engage in "duplicative discovery" that has "already occurred in the Civil [Case]," but, given that the trial in the Civil Case has been stayed and will not occur for nearly a year and half, making a determination on coverage before the trial in the Civil Case will both "serve a useful purpose in clarifying and settling the legal relations in issue," and "terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Nautilus*, 15 F.3d at 375 (quoting *Quarles*, 92 F.2d at 325). Because Plaintiff's duties to defend and to pay damages arising from the Civil Case represent the only controversy between these parties, adjudication of the case

through declaratory judgment would resolve their entire dispute. Most importantly, although Respondents argue that efficiency warrants determination of insurance coverage in the Virginia courts, the Virginia Circuit Court in the Civil Case previously stayed its proceedings specifically to allow this court to make a determination on the insurance issue.  This factor thus weighs in favor of proceeding with this declaratory judgment action.

Respondents also argue that there are "overlapping issues of fact or law" that would cause entanglement between the federal and state court actions because a determination of Defendant's intent might "put at risk, by issue preclusion or claim preclusion, the ability of any state court to adjudicate fairly the underlying liability."  *Icarom*, 904 F.Supp. at 460. At the motions hearing, Respondents pointed to the claim for the intentional torts of assault and battery in Count Four of the Civil Case.  Although many of the factual determinations that will need to be decided in the Civil Case will not overlap here, there is some potential for overlap with regard to Defendant's intent, if Virginia tort law regarding intoxication and intent aligns with Maryland insurance law on the same issues.  There is therefore some risk of entanglement.

In *United Capital Ins. Co. v. Kapiloff*, 155 F.3d 488, 494 (4th Cir. 1998), the Fourth Circuit held that declaratory judgment was appropriately employed when only the third factor

weighed in favor of abstention.  Moreover, the entanglement was stronger in that case than it is here because the state and federal actions revolved around entirely "the same core issues of law and fact," but the court still found declaratory judgment was appropriate.  *Id.*[3]  A similar conclusion was reached in *State Farm Fire & Cas. Co. v. Oliver*, No. ELH-15-2140, 2015 WL 5934669, at *1-*5 (D.Md. Oct. 8, 2015).  Weighing all four factors, proceeding with this declaratory judgment action is appropriate.

**V.   Denial of Coverage Based on an Intentional or Expected Act**

   **A.   Duty to Pay Damages**

   In Maryland, insurance policies are to be construed pursuant to "ordinary principles of contract interpretation." *Megonnell v. United Servs. Auto. Ass'n*, 368 Md. 633, 655 (2002). Thus, the words used in an insurance policy should be given "their usual, ordinary, and accepted meaning" – i.e., the "meaning a reasonably prudent layperson would attach to the term." *Bausch & Lomb Inc. v. Utica Mut. Ins. Co.*, 330 Md. 758, 779 (1993).  Where the provisions of an insurance policy are unambiguous, the meaning of the terms is determined by the court as a matter of law.  *Cole v. State Farm Mut. Ins. Co.*, 359 Md. 298, 305 (2000).

---

[3] The comity issue was also closer in that case because the state court was in Maryland and was applying Maryland law.

The two Exclusions in the Policy bar coverage for injuries that are (1) "either expected or intended by the insured;" or (2) "the result of willful and malicious acts of the insured." (ECF No. 23-4, at 21).  Plaintiff argues that there is no dispute of fact that "[Defendant's] actions which directly caused Yeardley Love's death were intentional and [Yeardley] Love's injuries were expected and result from the willful and malicious acts of [Defendant]." (ECF No. 23-2, at 28).  As will be discussed, Plaintiff has failed to show that there is no dispute of material fact as to these issues.

Ordinarily, to exclude coverage based on an intentional acts provision, an insurer must show that the insured subjectively intended the harmful results, not simply the acts that led to the harms.

> The exclusionary clause in the present case does not contain these words; instead it excepts "damage which is either expected or intended from the standpoint of the Insured."  Admittedly, the issue is the same if stated in rough terms: whether the loss was intentional or accidental.  The precise approach to be used, however, differs in two important respects.  First, there is the question of whether the *results* or the *means* must have been intended.  The Allstate policy indicates, in our view, that the insured must have intended the results ("damages"), not simply the causing act, for coverage not to apply.  In contrast, "caused by accident" is ambiguous with regard to this distinction, as the *Haynes* court noted. 228 Md. at 400, 179 A.2d at 904.  Second, the Allstate policy provides that the result must be expected or intended "from the

13

> standpoint of the Insured," thereby
> requiring, we believe, a more subjective
> standard for intent than the test of
> foreseeability applied in *Harris & Brooks*
> and *Treas*.

*Allstate Ins. Co. v. Sparks*, 63 Md.App. 738, 742-43 (1985).
Plaintiff acknowledges that malice similarly requires that the
harmful act be made "to deliberately cause harm or injury."
(ECF No. 23-2, at 33 (citing *Henderson v. Md. Nat'l Bank*, 278
Md. 514, 519 (1976))).

Plaintiff attempts to fit this case into an exception to
the general rule by comparing it to other coverage cases
indicating that some acts are so likely to cause harm that
intent to commit the act establishes an intent to cause the
resulting harm. *See, e.g.*, *Harpy v. Nationwide Mut. Fire Ins.
Co.*, 76 Md.App. 474, 483-84 (1988).

> While it is true that an intended act
> causing unintentional injury, under some
> circumstances, can be considered negligence,
> "[a]s the probability of injury to another,
> apparent from the facts within [the
> injurer's] knowledge, becomes greater, his
> conduct takes on more of the attributes of
> intent, until it reaches that substantial
> certainty of harm which juries, and
> sometimes courts, may find inseparable from
> intent itself."

*Id.* (quoting *Ghassemieh v. Schafer*, 52 Md.App. 31, 41 (1982))
(finding that the intent to act and the intent to harm are
inseparable in a child molestation case). Plaintiff further
contends that the inclusion of the term "expected" along with

14

"intended" in insurance contracts was designed to ensure that coverage is similarly excluded where an act is "so certain to cause a particular harm that it can be said that a person who performed such an act intended the harm." *Clark v. Allstate Ins. Co.*, 22 Ariz.App. 601, 602 (1975). Citing to Webster's New Collegiate Dictionary, Plaintiff reiterates that to "expect" is "to anticipate . . . the coming occurrence; to consider probable or certain." (ECF No. 23-2, at 31). Plaintiff makes similar arguments that malice might be inferred from the circumstances under which the tort is committed. (*See* ECF No. 23-2, at 33 (citing cases)).

After laying out these exceptions, however, Plaintiff makes almost no reference to any evidence in the record supporting the legal conclusions that Defendant's acts are intentional, expected, or willful and malicious. At best, the cases Plaintiff cites stand for the proposition that there is sometimes "no dichotomy between the damages resulting from [the insured's] conduct and his intent to perform the acts [that cause the harm]," because the harm is "entirely contained within the activity [to] which he admits." *Pettit*, 349 Md. 786. But Plaintiff fails to explain what specific acts it can show Defendant took during the murder of Yeardley Love and whether those acts are similar to the acts that courts have previously considered "substantially certain" to cause resulting harms.

15

Even if the cases Plaintiff cites supported the application of these propositions here, Plaintiff's evidence also fails to answer the precedent question of whether Defendant intended to commit any of the acts that he engaged in on the night of Yeardley Love's murder. Conspicuously absent from the section of Plaintiff's motion on its duty to pay damages is any reference to the implications of Defendant's intoxication. When asked about Defendant's intoxication at the motions hearing, Plaintiff referenced *Pettit v. Erie Ins. Exch.*, 349 Md. 777 (1998), *Lititz Mut. Ins. Co. v. Bell*, 352 Md. 782 (1999), and *Erie Ins. Exch. v. Stark*, 962 F.2d 349 (4th Cir. 1992). According to Plaintiff, these cases addressing an insured's state of mind set a high bar for excusing an individual's intent. In these cases, the courts dealt with individuals with pedophilia, explosive rage disorder, and suicidal depression. In *Pettit*, the Court of Appeals of Maryland rejected evidence that an insured who "suffered from a mental disorder known as pedophilia . . . did not have the intent to harm" the children who were his victims. *Pettit*, 349 Md. at 784. The court adopted the rule that pedophilia is not relevant to one's capacity to form intent. *Id.* at 787. In *Lititz*, the insured suffered from "intermittent explosive disorder," a mental illness recognized by the American Psychiatric Association as involving "the occurrence of discrete episodes of failure to

16

resist aggressive impulses that result in serious assaultive acts." *Lititz*, 352 Md. at 795. The court, however, emphasized that the insured could not rely on his mental illness because he admitted that his assaults were intentional and was only arguing that the harms were not intended. *Id.* at 796-98. The *Lititz* court also made note: "If [the insured] has not intended the contact itself due to a mental condition, then the act might be considered an 'accident' and not intentional because the contact (the harm) would have taken place without his foresight or expectation." *Lititz*, 352 Md. at 798. In *Stark*, the insured suffered from a deep depression and allegedly attempted to commit suicide. Although the court questioned the authenticity the insured's suicide attempt, it acknowledged that if the insured were truly insane, "theoretically, [the insured's] mental state might also be found such as to negate all of [the insurer's] coverage avoidance defenses even if his purpose was not solely to commit suicide." *Stark*, 962 F.2d at 354, 356. Because there were factual questions at issue in the case, the court vacated the district court's grant of summary judgment.

These cases thus support Plaintiff's position modestly, if at all, and they acknowledge that an insured's state of mind might affect both his intent to harm *and* his intent to commit the acts causing the harm. In the decision from the Court of Appeals in *Saba v. Darling*, 320, Md. 45, 50 (1990), the court

seemed to recognize that some amounts of alcohol might reduce a person to being "so intoxicated that he could not perform intentional acts." *Id.* Although the evidence in that case indicated that the assailant was in fact "able to form the conscious intent" to assault his victim, the court's language suggests that intoxication could push an individual past that threshold. *Id.*

In the instant case, Ms. Love has produced an expert witness affidavit stating that Defendant was "so intoxicated that he lacked the capacity to form the specific intent to hurt [Yeardley] Love" and that he also "lacked the capacity to be aware that he was committing any crime." (ECF No. 27-2, at 6). The affidavit further states that the amount of alcohol Defendant had consumed would have resulted in an "inability to form a plan or develop an intent" and left him "without reason or understanding of the consequences of his behavior." *Id.* Thus, despite Plaintiff's urgings, there is clearly a dispute of fact over whether "the risk and danger [of his actions] were known or should have been known at the time." (ECF No. 23-2, at 33). Therefore, Plaintiff's motion for summary judgment cannot be granted on this issue.

### B. Duty to Defend

Even where an insurer's duty to defend against a suit is based on its potential liability in that suit, the duty to

defend is distinct from the duty to indemnify. *Walk v. Hartford Cas. Ins. Co.*, 382 Md. 1, 15 (2004).

> In determining whether a liability insurer has a duty to provide its insured with a defense in a tort suit, two types of questions ordinarily must be answered: (1) what is the coverage and what are the defenses under the terms and requirements of the insurance policy? (2) do the allegations in the tort action potentially bring the tort claim within the policy's coverage? The first question focuses upon the language and requirements of the policy, and the second question focuses upon the allegations of the tort suit.

*St. Paul Fire & Marine Ins. Co. v. Pryseski*, 292 Md. 187, 193 (1981). Because the duty to defend is a "broader" duty, *Walk*, 382 Md. at 15, if there is any doubt as to "whether or not the allegations of a complaint against the insured state a cause of action within the coverage of a liability policy sufficient to compel the insurer to defend the action, such doubt will be resolved in [the] insured's favor." *Aetna Cas. & Sur. Co. v. Cochran*, 337 Md. 98, 107 (1995) (quoting *U.S. Fid. & Guar. Co. v. Nat'l Paving Co.*, 228 Md. 40, 54 (1962)). Defendant obviously still faces potential liability under Ms. Love's negligence claims, and it cannot be declared that Plaintiff owes no duty to defend him in the Civil Case in accordance with the terms of the Policy.

19

## VI.  Failure to Cooperate

The Policy provides that an insured "shall perform the following duties" and "shall cooperate with [Plaintiff] in seeing that these duties are performed: . . . at our request, assist in: . . . securing and giving evidence and obtaining the attendance of witnesses." (ECF No. 23-4, at 18).  Plaintiff argues that Defendant's failure to submit to an examination under oath constitutes a breach of his contractual obligations under the Policy and that this breach "preclude[s] him from receiving coverage under the State Farm policy in the Civil [Case]." (ECF No. 23-2, at 18).

In their papers and at the motions hearing, neither Respondents nor Ms. Love has disputed that Defendant breached these provisions of the contract.  Rather, they point to section 19-110 of the Insurance Article of the Maryland Code, which states that

> An insurer may disclaim coverage on a liability insurance policy on the ground that the insured or a person claiming the benefits of the policy through the insured has breached the policy by failing to cooperate with the insurer or by not giving the insurer required notice only if the insurer establishes by a preponderance of the evidence that the lack of cooperation or notice has resulted in actual prejudice to the insurer.

According to Respondents, Plaintiff has failed to show any actual prejudice due to Defendant's failure to cooperate.  They

rely on *Allstate Insurance Co. v. State Farm Mutual Automobile Insurance Co.*, 363 Md. 106, 127-28 (2001), which held that "the proper focus" in determining prejudice should be on whether the insured "has, or may reasonably have, precluded the insurer from establishing a legitimate jury issue of the insured's liability."   Under *Allstate v. State Farm*, the insurer need not meet the high bar of proving "that the verdict was the result of the lack of cooperation," but must, at least show "that the failure of cooperation has, in a significant way, precluded or hampered it from presenting a credible defense to the claim." *Id.*   According to Respondents, Plaintiff has not provided any evidence that it could have produced different "credible defenses" or established "legitimate jury issues" if Defendant had testified.   (ECF No. 25, at 16, 19-22; *see also* ECF No. 27, at 12-13).

Although Plaintiff does not address prejudice directly in its papers, it does say that asking Defendant certain enumerated questions "would have allowed State Farm to know exactly what happened that night for purposes of determining whether he is entitled to a defense or indemnification under the subject insurance policy."   (ECF No. 23-2, at 24; *see also id.* at 19). At the motions hearing, Plaintiff adopted Chartis's reliance on *Metlife Auto & Home v. Cunningham*, 59 Mass.App.Ct. 583 (2003). In that case, the tort plaintiffs Robert and Edwina Beland

accused the insured, Brian Cunningham, of killing their son
Jason. *Id.* at 584.  Mr. Cunningham sought to have Metlife, his
insurer, cover his defense and liability in the tort suit.  *Id.*
Mr. Cunningham agreed to sit for an examination under oath, but
he then proceeded to invoke the Fifth Amendment whenever he was
asked any questions about Jason's death. *Id.* at 585.  The court
held that Defendant breached his duty to "cooperate with
[Metlife] and assist [Metlife] in any matter concerning a claim
or suit," but acknowledged that Massachusetts common law
required "an affirmative showing of actual prejudice" in order
to relieve an insurer of its coverage duties.  *Id.* at 586, 590.
The court rejected the Belands' argument that Cunningham had no
duty to cooperate with Metlife in the context of the declaratory
judgment action because it was his adversary in that case.  *Id.*
at 589.  Instead, it held that the duty to cooperate included
"the obligation to provide accurate information bearing on
coverage," noting that the duty to cooperate exists because an
insurer "[t]ypically . . . has little or no knowledge of the
facts surrounding a claimed loss" and is therefore entirely
"dependent on its insured for fair and complete disclosure."
*Id.*  The court found that Cunningham's unwillingness to provide
information to Metlife prejudiced it in the context of its
coverage exclusion defense for intentional acts.  "Because
coverage or lack thereof involved Cunningham's intentions, his

22

statement about his own intent and expectations would have been of enormous value," and the absence of his statement was sufficient to prejudice Metlife in the coverage case. *Id.* at 591.

Plaintiff does not cite to any Maryland cases supporting *Cunningham*'s premise that prejudice can occur in the coverage area, as opposed to the underlying tort suit, and the parties dispute the context in which the prejudice must occur under Section 19-110. *Allstate v. State Farm* focused exclusively on "a legitimate jury issue *of the insured's liability*" and "a credible defense *to the [tort] claim,*" and thus appears to support the position that prejudice must occur in the underlying tort claim – that is, the insurer is prejudiced because it cannot properly represent the insured against a third party. Under *Cunningham*, on the other hand, prejudice to the insurer can also occur in coverage disputes – that is, the insurer is prejudiced because it cannot properly defend itself against the insured.

At least one treatise on insurance law clearly takes the *Cunningham* view, stating that "[a]n insurer may prove prejudice by showing that the failure to cooperate substantially impaired its ability to investigate the insured loss or liability claim, to defend against an otherwise-insured liability claim, *or to investigate and develop defenses to coverage*." 3 Jeffrey E.

Thomas, New Appleman on Insurance Law Library Edition §
20.02[5][d] (3[d] ed. 2012).   Another treatise posits both sides of
the issue, but prefers the articulation from *Cunningham*:

> Note that the insured's duty to cooperate
> under a liability policy ordinarily relates
> only to issues impacting on liability to the
> plaintiff.   It has, in fact, been held that
> the cooperation provision is not breached if
> the insured's lack of cooperation relates
> only to the issue of coverage.   *See Martin
> v. Travelers Indem. Co.*, 450 F.2d 542, 553,
> (5th Cir. 1971) (Mississippi law) (insured's
> misrepresentations to insurer of no
> significance because they related only to
> the issue of coverage under the policy and
> had no bearing on liability to the
> plaintiff).
>
>         The better rule is to the contrary.
> *E.g., Waste Management, Inc. v.
> International Surplus Lines Ins. Co.*, 144
> Ill. 2d 178 (1991) (A duty to cooperate
> provision created an obligation on the part
> of the insured to "disclose all of the facts
> within his knowledge and otherwise to aid
> the insurer in its determination of coverage
> under the policy" — even though the
> provision did not "expressly" so state.   The
> Court broadly held that the purpose of the
> cooperation clause was to enable the insurer
> to protect its interests); *Owens-Illinois,
> Inc. v. United Ins. Co.*, 138 N.J. 437, 650
> A.2d 974, 996 (1994) (an insured's duty to
> cooperate encompasses providing its insurer
> information that would enable the insurer to
> evaluate the insured's request for
> coverage).

Allan D. Windt, 1 Insurance Claims & Disputes § 3:2 at n.1 (6th
ed. 2016).

        There is one case involving Maryland law and applying § 19-
110 that offers some support for this view, but it is a decision

of this court, and not a Maryland court.   In *Ball v. NCRIC, Inc.*, 174 F.Supp.2d 361, 366-67 (D.Md. 2001), *rev'd Ball v. NCRIC, Inc.*, 40 F.App'x 760 (4th Cir. 2002), the trial court held that the insured's failure to cooperate was prejudicial for multiple reasons.   The court emphasized both that cooperation would have given the insurer "a chance to discover any mitigating circumstances to defend [the insured] against [the third party's] claim," and that the insurer "was unable to ascertain whether [the claims] were intentional torts, which are not covered under the policy."   *Id.* at 367.   The Fourth Circuit reversed that decision in an unpublished opinion.   *Ball v. NCRIC, Inc.*, 40 F.App'x at 765.   The court acknowledged that the district court's conclusion had rested in part on the premise that "had [the insured] cooperated, he might have provided testimony that would have demonstrated . . . that [the insurer] had no duty to indemnify."   *Id.* at 762.   It reversed the district court's decision on the ground that the insured was only non-cooperative for a number of years while he was a fugitive, and the insurer had not attempted to garner his cooperation after he had been apprehended, but before the declaratory judgment action was brought.   *Id.* at 763; *cf. U.S. Specialty Ins. Co. v. Skymaster of Virginia*, 26 F.App'x 154, 158 (4th Cir. 2001) (unpublished opinion) (holding, under Virginia law, which does not apply the prejudice standard, that an

25

insured could not avoid answering certain questions as immaterial just because the questions related to coverage exclusions rather than aiding the defense in the tort litigation).

Nearly all of the Maryland cases applying § 19-110 seem to have considered prejudice in the same context as in *Allstate v. State Farm*, namely the underlying tort claim. Those decisions, however, were a result of the facts presented and simply do not address prejudice in the context of a coverage exclusion dispute. As the court in *Allstate v. State Farm* stated, "[i]t is very difficult to fashion a workable 'one size fits all' standard" because of "the very different circumstances, and thus the very different kinds of prejudice, that can be presented by breaches of [the duty to cooperate] provisions." *Allstate v. State Farm*, 363 Md. at 124.

It thus appears to be an open question whether prejudice under Section 19-110 can occur in the coverage dispute, as opposed to the underlying tort suit. In applying the law of Maryland, a federal district court must:

> interpret the law in accordance with the Court of Appeals of Maryland, or where the law is unclear, as it appears that the Court of Appeals would rule. *See Liberty Mut. Ins. Co. v. Triangle Indus.*, 957 F.2d 1153, 1156 (4th Cir. 1992) (holding that if state law is unclear federal courts must predict the decision of the state's highest court); *Brendle v. General Tire & Rubber Co.*, 505 F.2d 243, 245 (4th Cir. 1974). To forecast a

> decision of the state's highest court we can
> consider, *inter alia*: canons of
> construction, restatements of the law,
> treatises, recent pronouncements of general
> rules or policies by the state's highest
> court, well considered dicta, and the
> state's trial court decisions. *See Liberty
> Mut.*, 957 F.2d at 1156.

*Wells v. Liddy*, 186 F.3d 505, 527–28 (4th Cir. 1999). If a case

presents a determinative novel issue of state law, certification

to the Court of Appeals under section 12-603 of the Courts

Article of the Maryland Code may be appropriate, but

certification should be approached cautiously:

> Where there is no case law from the forum
> state which is directly on point, the
> district court attempts to do as the state
> court would do if confronted with the same
> fact pattern. *Wilson v. Ford Motor Co.*, 656
> F.2d 960[] (4th Cir. 1981); *Empire
> Distributors of N.C. v. Schieffelin & Co.*,
> 859 F.2d 1200, 1203 (4th Cir. 1988); *Doe v.
> Doe*, 973 F.2d 237, 240 (4th Cir. 1992). Only
> if the available state law is clearly
> insufficient should the court certify the
> issue to the state court. *Smith v. FCX,
> Inc.*, 744 F.2d 1378, 1379 (4th Cir. 1984),
> *cert. denied*, 471 U.S. 1103, 105 S.Ct. 2330,
> 85 L.Ed.2d 848 (1985).

*Roe v. Doe*, 28 F.3d 404, 407 (4th Cir. 1994).

At this juncture, it would be premature to consider

certification in any event. Although Plaintiff may have

produced evidence of the reasonableness of its investigation,

the evidence of the impact of Defendant's recalcitrance is not

so overwhelming as to prove prejudice as a matter of law. There

has been an entire criminal trial on the underlying event, which

included a video taped interview with Defendant. Other individuals are available who can provide, and apparently have provided, evidence related to Defendant's residence at the time. While there remain disputes of material fact precluding resolution of the exclusion issues, Plaintiff has not shown as a matter of law that Defendant's failure to submit to an examination under oath or otherwise to answer its questions prejudiced its ability to assert a coverage defense. Accordingly, Plaintiff's motion will not be granted based on Defendant's failure to cooperate.

## VII. Conclusion

For the foregoing reasons, the motion for summary judgment filed by Plaintiff State Farm Fire and Casualty Company will be denied. A separate order will follow.


                                        /s/
                        _____
                        DEBORAH K. CHASANOW
                        United States District Judge